SISCILIA SBARBERO (otherwise called Matilda Barber), guardian, &c.,

*v.*

ALEXANDER A. MILLER et al.

[Decided January 8th, 1907.]

1. Judgments are presumptively only conclusive against parties in the character in which they sue or are sued.

2. The necessity of mutuality in estoppels by record requires that a court should not hold a judgment conclusive in favor of a person, unless it would be equally conclusive against him.

3. A judgment is conclusive by way of estoppel only as to facts without the existence and proof or admission of which it could not have been rendered

4. A judgment in favor of plaintiff in ejectment, defended on the ground that his title was founded on a conveyance executed by one not having sufficient mental capacity, is not *res judicata* that the grantor was *non compos*, although the jury, in a special finding, so found. The judgment being entered for plaintiff, this element did not enter into it.

5. In a suit to set aside an assignment of a leasehold interest on account of the mental incapacity of the assignor, the finding of a committee in lunacy, a few months after the conveyance, declaring the assignor a lunatic, is only *prima facie* evidence of his incompetency.

6. In a suit to set aside an assignment of a leasehold interest on the ground of the mental incapacity of the assignor, evidence examined, and *held* to fail to show that there was any such impairment of the assignor's mind as made him incapable of understanding in a reasonable manner the nature and effect of his acts or of the business that he was transacting, essential to warrant a decree of cancellation.

7. In a suit to set aside an assignment of a leasehold interest on the ground that the purchaser paid less than the market value for it, evidence examined, and *held* not to establish that there was any market value of the leasehold interest in excess of what was paid for it.

Heard on bill, answer, cross-bill, answer to cross-bill and replications.

This is a bill filed by John Barber, a lunatic, by Cecilia Matilda Barber, his guardian, against Alexander A. Miller and another. The bill charges that on the 26th of June, 1903, John Barber, then being in a state of lunacy, did, by deed of assignment, transfer unto Anna C. Miller a certain lease of property known as No. 879 Broad street, Newark, New Jersey, and that the said Anna C. Miller, on the 1st of July, 1903, assigned said lease to Alexander A. Miller; that on the 10th of October, 1903, Matilda Barber was appointed by the orphans court of Essex county, as guardian of John Barber, a lunatic, and by the proceedings in lunacy it was, among other things, determined that the said John Barber was, at the time of the said proceeding, namely, on the 9th of September, 1903, a lunatic without lucid intervals, and that he had been a lunatic for the space of two years and six months then last past; that John Barber, at or about the date of the conveyance of the leasehold, as above stated, disappeared from his home in the city of Newark and has never been heard of or from since; that the said Alexander A. Miller has collected the rents of the premises from the 1st of July, 1903,

and is still collecting the same; that Alexander A. Miller was informed before the transfer of the lease by John Barber to him of the lunacy of the said John Barber and was thoroughly aware of the lunacy before the transfer was made; that said leasehold is valuable, having a market value of about $10,000, and that said John Barber received from Miller for the said property much less than its true market value, to wit, $3,500 or thereabouts; that the guardian made legal tender to Miller of the sum of $3,500 on the 27th day of October, 1904; that Miller, on or about the 1st day of January, 1904, brought an action of ejectment in the supreme court of this state seeking to oust said Matilda Barber and others, the wife and children of the said John Barber, from the possession of the second and third floors of the said building; that said suit was tried, certain questions were submitted to the jury, which found a special verdict, which special verdict is set out in full in the bill, and that on motion in the supreme court a verdict was directed to be entered for the plaintiff therein, Miller; that an opinion was filed in the supreme court directing the entry of the said judgment, which opinion is set out in full in the bill.

The complainant prays that the said lease from John Barber to Miller may be avoided and Miller be directed to reassign the same to the complainant; that a reference be had to a master to ascertain the amount due from Miller to the complainant, and that an injunction issue restraining Miller from issuing execution in the ejectment suit aforesaid.

To this bill Anna C. Miller files an answer admitting that she took title to the lease from Barber as a convenience for the defendant Alexander A. Miller, and that she has no interest.

Alexander A. Miller answered admitting the appointment of the guardian, the purchase of the leasehold by him, denying, however, that John Barber was in a state of lunacy at the time, or was in any way affected mentally; sets out that while he has collected some of the rents, the family of John Barber has collected a much larger proportion of them; specifically denies that he had any knowledge, or that there was any implication on his part of knowledge of the alleged lunacy of John Barber; denies that the market value of the leasehold was $10,000, and

asserts that the amount paid, $3,500, was a full, fair and *bona fide* value; admits that some tender was made, but denies knowledge of the amount; admits the ejectment suit for the second and third floors of the building; admits that the supreme court filed an opinion, but denies its relevancy to this suit; sets out the affirmative defence of the defendant, and prays to be dismissed.

By way of cross-bill he asks an account of the rents received by the complainant and a decree that she be required to pay the same to him.

The answer to the cross-bill and the replications are formal and do not require specification.

*Messrs. Munn & Church,* for the complainants.

*Mr. George H. Peirce,* for the defendants.

GARRISON, V. C. (after stating facts).

It will be observed that while, in the charging part of the bill, the complainant alleges that she tendered, as guardian of the alleged lunatic, to Miller, the purchaser of the leasehold, the consideration paid by Miller for it, namely, $3,500, she does not in the prayer of her bill ask that the *status quo* be restored by the conveyance back to her of the leasehold interest, and the payment by her of the consideration received for it. She prays that the assignment of the lease from Barber to Miller be avoided, and Miller be directed to reassign to her, and that a reference be had to ascertain the amount due from Miller. This prayer must have been based upon the theory that she would prove, as alleged in the bill, not only that Barber was insane, and that an inadequate price was paid for the property, but also that Miller had knowledge of Barber's insanity, and therefore was not entitled to be reimbursed the consideration money paid by him. There was some attempt to prove that Miller had knowledge, but it entirely failed, and I shall therefore treat the case as if it were one in which the complainant prayed for a restoration of the *status quo.*

The initial matter to be dealt with arose during the progress of the final hearing, and the court disposed of it without giving the reasons for its ruling; and since, if the court erred in such ruling, a correction thereof will be dispositive of the case, I think it best to take up this subject first.

Before the complainant introduced any oral testimony she put in evidence the record of the ejectment suit in the supreme court. At the time of putting this record in evidence counsel for the complainant remarked that he thought it operated as a bar or estoppel against the defendants, and the court inquired whether he desired to rest upon it as such and therefore not to introduce any further or other evidence excepting as to tender. Counsel for the complainant not being willing at that time to take that position, proceeded with the examination of his witnesses and took testimony tending to prove the insanity or lack of mental capacity of John Barber, the knowledge or implication of knowledge thereof on the part of Miller, the value of the leasehold and the tender made by the complainant to the defendants.

When the defendants began their case and sought to interrogate a witness concerning the mental capacity of John Barber an objection was interposed by the complainant to such evidence upon the ground that the judgment in the ejectment suit was a bar or estoppel. The record of that suit in evidence may be briefly summarized as follows: Miller sued in ejectment for the possession of the second and third floors of the premises No. 879 Broad street, and declared upon the assignment by John Barber of the lease in question. He made as defendants Cecilia (or Sisillia) Barber, Catilda Barber and Elizabeth Barber. The defendants pleaded not guilty. It is quite evident that their defence was that John Barber, at the time of selling the lease, was insane to the knowledge of Miller, that the latter paid an inadequate price, and that the deed of assignment was void. The trial court left to the jury certain questions of fact and requested special findings. The jury, among other things, found that on the day of making the assignment John Barber was mentally incapable of understanding the nature and effect of the transaction in which he was then engaged; that Miller did not know at that time,

nor did he have such knowledge as would lead a reasonably prudent person to the belief, that said John Barber was mentally incapable of understanding or appreciating the nature and effect of the transaction in which he was then engaged; that the price paid by Miller was not the fair market value at that time, but was $1,500 below such fair market value. The commission in lunacy proceedings were adverted to, and the fact that

"in pursuance of said proceedings, Matilda Barber, one of his daughters, who is also a defendant in this action, was appointed as guardian by the orphans court on October 10th, 1903, prior to the beginning of this action,"

and that said Matilda Barber, together with her mother and brother and sisters, were in actual possession of said second and third floors at the time of the beginning of the suit, and that no formal tender of any amount to Miller was ever made by or on behalf of John Barber or his guardian.

Upon motion in the supreme court a judgment was ordered to be entered upon this special verdict in favor of the plaintiff.

The contention of the complainant in the suit at bar is that the judgment just referred to in the ejectment suit is a bar or estoppel, or, to properly phrase the matter, is conclusive evidence between the parties hereto, and establishes that John Barber, at the time of the assignment of the lease, was *non compos,* and therefore that subject is not open for litigation in the pending suit.

The defendant replies, first, that the prior suit was not between the same parties, since Matilda Barber, by whom John Barber brings this suit as his guardian in lunacy, was not a party therein as guardian, nor was John Barber a party.

It is true that judgments are presumptively only conclusive against parties in the character in which they sue or are sued. *McBurnie* v. *Seaton, 111 Ind. 56.* And there are numerous instances in which one who was a party in his individual capacity is not bound by the judgment in another capacity, such as executor, trustee or guardian, and *vice versa.* *Davis* v. *Davis, 30 Ga. 296; Erwin* v. *Garner, 108 Ind. 488; Lander* v. *Arno, 65 Me. 26; Terrill* v. *Boulware, 24 Mo. 254; Rathbone* v. *Hooney, 58*

*N. Y. 463; Landon* v. *Townshend, 112 N. Y. 99; Coffin* v. *City of Brooklyn, 116 N. Y. 165; Collins* v. *Hydorn, 135 N. Y. 320; First National Bank* v. *Shuler, 153 N. Y. 172 et seq.*

The absolute necessity of mutuality in estoppels by record requires that the court should not hold a judgment conclusive in favor of a person unless it would be equally conclusive against him.

Parties in the capacity in which they sue and are sued are undoubtedly bound; privies, likewise. But this is not the limit to which the courts have gone. The courts have held that where a person was either a party to the record in some capacity, or had so allied and identified himself with a party as to have had his rights submitted by his consent to the determination of the court in a given case, he is bound by the judgment as if he was an actual party to the record, and if an actual party to the record in some capacity, is bound in every capacity in which his rights were affected.

Furthermore, in the suit in hand, I find that the supreme court refers to the fact that Matilda Barber was appointed the guardian, and recites that she was in actual possession of a part of the premises, and as guardian requested a reconveyance, and offered to return the amount of consideration upon a proper accounting. *Miller* v. *Barber, 62 Atl. Rep. 276 (Supreme Court, 1905).*

I do not, therefore, rest my ruling, with respect to the admissibility of this testimony, upon the fact that Matilda Barber, as guardian, was not a party defendant in the ejectment suit.

I assume, for the purpose of this ruling, that the prior suit was one in which the complainant here, as well as the defendant here, were each parties in the capacities in which they stand in the pending suit.

I ruled that the testimony offered by the defendants as to the mental capacity of John Barber was admissible, and that the judgment in the ejectment suit was not conclusive evidence as between these parties that John Barber was mentally incompetent at the time in question.

The fundamental principle of *res adjudicata* is that the sub-

ject-matter must have been settled in the previous litigation between the same parties.

"A judgment estops the parties only as to the grounds covered by it and the facts necessary to uphold it." *Herm. Estop. 105* § *105*. "Even parties and privies are bound only so far as regards the subject-matter then involved, and are at liberty to raise the same questions in another distinct controversy affecting a distinct cause of action." *Herm. Estop. 124* § *118*. "And they will not be concluded unless the judgment necessarily involved the matter which it is sought to be held as conclusively settled by the litigation." *Herm. Estop. 291* § *252 et seq.*

A verdict and judgment, therefore, are conclusive by way of estoppel only as to the facts, without the existence and proof or admission of which they could not have been rendered. *Herm. Estop. 294* § *254*. See, also, *Coutant* v. *Feaks, 2 Edw. Ch. 330; People* v. *Johnson, 38 N. Y. 63; Cauhape* v. *Parke, Davis & Co., 121 N. Y. 152; Gilcreast* v. *Bartlett (N. H.), 64 Atl. Rep. 767; Freem. Judg. (3d ed.) 305 et seq.; Mullaney* v. *Mullaney, 65 N. J. Eq. (20 Dick.) 384 (Court of Errors and Appeals, 1903).*

In the case of *Hawks* v. *Truesdell, 99 Mass. 557,* it was held that where the special findings of a jury in an action at law were not confirmed by the judgment of the court, nor involved in the general verdict, they were not conclusive of the facts found, and either party might introduce evidence concerning the subject-matter in a trial before another jury in the same suit or in another suit.

In *Springer* v. *Bien, 128 N. Y. 100,* the court said: "Neither the verdict of a jury nor the findings of a court in a prior action upon the precise point involved in a subsequent action between the same parties constitute a bar unless followed by judgment based thereon, or into which the verdict or finding entered. It is the judgment which constitutes the bar, and not the preliminary determination of the court or jury. So, also, and for obvious reasons, although judgment has been entered, the judgment does not prevent the relitigation of any irrelevant fact, although it may have been litigated and found in the prior action."

In the situation in hand it is obvious that it was not necessary to settle that John Barber was insane in order to sustain a judgment in favor of Alexander A. Miller against the defendants in that suit that he was entitled to the possession of the property. In fact, quite the contrary is the case, because if John Barber were sane there was no suggested defence to Miller's action.

The things, therefore, which it was necessary to find in favor of Miller were a title from Barber, and innocence of any knowledge on his part of any incapacity on Barber's part. Since the defendants failed to prove that Barber was insane to Miller's knowledge, they failed in their defence, and I do not see how it is possible to hold that by thus failing they established, as between themselves and Miller, any part of that which they must have proved to have succeeded.

That judgment may properly be said to show that proof of Barber's capacity in that suit was immaterial and irrelevant.

Without proof that Miller was chargeable with knowledge of Barber's incapacity, proof of Barber's incapacity was irrelevant in the ejectment suit, and hence it cannot be held that it was therein settled as between the parties. The cases heretofore cited are authority for the principle that a settlement in a previous suit of an irrelevant matter which did not enter into the judgment is not conclusive in subsequent litigation.

Furthermore, I think that the fact that Miller is sought to be bound by a finding in a suit from the judgment entered in which he was powerless to appeal, or to take proceedings for review, makes strongly against the claim that he is concluded by such finding. Every fact which must have been found in his favor to have sustained his judgment, of course, binds him. But with respect to the matter which the complainant here seeks to have Miller bound he was powerless to obtain a review. The judgment not being in any way founded upon the fact of Barber's incapacity or insanity, and being in Miller's favor, should only be held conclusive against Miller of those things which must necessarily have entered into it to justify or sustain it.

To hold that a defendant has had settled in his favor certain facts in the face of a judgment in favor of his opponent which

does not rest upon such facts and is regardless of them, is, in my view, unjustifiable.

The complainant herein not having made out her defence in the lawsuit, and the defendant herein having entirely succeeded in the lawsuit, I hold that the latter's judgment is only conclusive of those facts which necessarily entered into it. It did not necessarily enter into that judgment that John Barber was insane, or that the purchaser of the leasehold had paid less than the market value for it.

I therefore ruled that those two subjects, not being concluded by the previous judgment, were proper subjects upon which to introduce testimony in the pending suit.

This brings us to the merits of the case.

I find the facts as follows: John Barber, in 1903, was about sixty-two years of age. He was an Italian, coming from a little settlement called Peruza, near Genoa. He was married and had at least six children, four girls, named Sisillia, Elizabeth, Julia and one whose name was not mentioned in the testimony given at the hearing, and two boys, Victor and Joseph. He came to the United States and settled in Newark. He was engaged in the selling of fruit from fruit stands on the street or in stores.

On the 20th day of June, 1890, he obtained the assignment of a lease on property No. 879 Broad street, in the city of Newark. Broad street is the main business street of Newark. This lease expired in 1908, and required him to pay a ground rent of $472.50, and provided that at the expiration of the term he might elect to have another term of twenty years upon a rent to be agreed upon between the parties, or, if they could not agree, then the amount of rent was to be settled by three arbitrators of which each party was to select one and the two thus selected were to choose the third. It was further provided that at the expiration of the lease the landlord (which was a church corporation) would either take over the building at a valuation to be fixed in accordance with provisions in the lease, or the tenant should remove the same in ten days if the landlord did not purchase it.

The building in question standing upon the land at the time he leased it was an old five-story brick building. Upon the

ground floor was a store fronting a little over fifteen feet on Broad street and extending back about fifty feet. The lot extended back from the street some one hundred and sixty feet to an alley, but it tapered so that at the alley it was only seven feet in width, and the back premises were useless for any other purpose than for egress, ingress and the storage of material. Above the store were flats. All the testimony in the case shows that a full rental value of the entire building was about $1,500 a year, the store being fairly rentable for from $75 to $100, the next two flats for between $20 and $25 each, the fourth floor for $12 or $15, and the top floor for from $9 to $12 a month.

Barber fitted up the ground floor for his fruit store, and occupied, with his family, the second and third floors, renting the other two to tenants. This continued down to December, 1902. At that time he was in debt to the extent of some $1,300. He was the executor of the estate of Rosa Schmidt, who was his sister. He was also a beneficiary under her will to the extent of one-third. The estate consisted of real estate and money, and there was a partition suit pending. While there was money in this estate at the time it had not then been settled as to how this money was to be distributed—that is to say, whether the beneficiaries would get part land and part money, or whether one would get money and the other land, or whether they would all have to wait until the partition suit was completed and a sale had.

Prior to December, 1902, he endeavored to sell his fruit business to a man who was a nephew of a friend of his named Mollinelli. He first wished to sell to Mollinelli, who was also a fruit dealer, but Mollinelli did not desire to enlarge his business by buying this other one, and said that he had a nephew who might be interested. Before carrying on any negotiations Mollinelli interviewed the wife of John Barber to ascertain whether she was willing that her husband should sell out the business, and testifies that she was willing. The negotiations then went on between Barber and the nephew of Mollinelli, with Mollinelli present, until Mrs. Barber upon one occasion visited Mollinelli and stated that she was not willing that the business should be sold at the price that was being suggested, which was in the

neighborhood of $600. Thereupon Mollinelli withdrew from any further participation in the matter, and his nephew and Barber could not come to terms.

Barber thereafter offered his business for sale to Zazzalli, meeting him in the fruit market and talking with him about the same. His first offer was to sell at $1,100. Subsequently, upon his again approaching Zazzalli, he was met by a counter-offer by Zazzalli of $800. This he refused. Further negotiations were had between them, and finally Barber agreed to take $1,000.

He then took Zazzalli to his lawyer, Mr. Trimble, and the bargain was told to Mr. Trimble, and about the 3d day of December, 1902, a bill of sale of the business and a lease to Zazzalli from Barber for the store at $70 a month were made and executed and the money paid, and thereafter Zazzalli carried on the business, Barber assisting him for a little time to introduce the customers to him.

I may here state that there is no evidence that what Barber sold at that time was worth any more than he got for it. About the same time, or a little after, Barber went to see the same lawyer, Mr. Trimble, with Mollinelli, who quite often acted as an interpreter for him, being able to speak the same dialect of Italian which he spoke, and wished to retain Mr. Trimble as associate counsel with Mr. Smith, who was attending to the settlement of the Rosa Schmidt estate and the partition suit. Barber informed Trimble that the trouble was that Mr. Smith was very slow, and the matter was not being settled up as rapidly as he wished, and he wanted Mr. Trimble to go into the matter so as to hurry Mr. Smith. Mr. Trimble saw Mr. Smith and got information from him, and reached the conclusion that matters were progressing properly, and when Barber next called upon him he informed him that there was no occasion for him to do anything just then. At about this time—that is to say, in the early spring of the year 1903—the matter of the settlement of the account of the Rosa Schmidt estate came up, and Barber visited Smith, the lawyer, several times, and the account was prepared by Smith, Barber producing whatever receipts he had for debts of the estate, or legacies that he had paid as executor, and that account was passed.

About the same time, in the early spring of 1903, Barber began to endeavor to dispose of the leasehold of No. 879 Broad street. He endeavored to sell it to various people. Among others, he began, some time in March, to have negotiations with August J. Miller, the brother of Alexander A. Miller. The Millers were in the electrical business around the corner of Broad street, on William street, and Barber, with Mollinelli, visited their establishment. These negotiations continued over a period of three months. Upon the first visit Miller was merely asked whether he would give $7,000 for a property on Broad street, and he replied that if the property was right he would, but Barber did not at that time state what property he referred to. Subsequently he came back and stated that the property was No. 879 Broad street, and Miller then wanted the papers that showed Barber's interest in the property. These were furnished and were taken to Coult, Howell & Ten Eyck, the counsel of Miller, and examined by them and reported upon favorably. Thereupon negotiations were continued, Miller refusing from the beginning to contemplate paying $7,000, but finally offering to pay $5,000, or, rather, he took an option for thirty days to purchase the leasehold at $5,000.

It was the understanding—Barber having so stated—that Miller could have immediate possession of the property. Miller's object in buying the property was to move his business around onto Broad street, which was much more desirable for him than William street, and of course he had in mind the desirability of getting there as soon as he should purchase this leasehold. Barber had informed Miller that the store property was leased to Zazzalli, but having informed him that he could get immediate possession, Miller was surprised when he learned, as he did subsequently by seeing the Zazzalli lease, that to get Zazzalli out he would have to pay him $1,000. He thereupon broke off all negotiations with Barber, telling him that since he had misrepresented this matter he would not any longer contemplate exercising his option to purchase. Thereafter Barber returned to see him and wanted Miller to make an offer. Miller then offered $3,500. He states that this offer was based upon the $5,000 offer previously made, of which $1,000 would have to go

to Zazzalli to get him out, $250 to Mollinelli, whom he had agreed to pay for his services, and $250 to the person from whom he intended to borrow the money with which to make the purchase. Finally Barber accepted this offer, and a date was fixed for settlement in the office of Coult, Howell & Ten Eyck. Upon that date, the 26th of June, 1903, Barber, Mollinelli and the Millers attended at Judge Ten Eyck's office to make the settlement.

There was a mortgage of Barber's which had to be paid to the mortgagee, and the balance was to be paid Barber in cash. Miller produced two checks making up this balance, one of which was certified and the other of which was not. Barber objected to taking checks, wanting cash. It was explained to him that certified checks were as good as cash, and that immediately upon presenting the same at the bank and being identified he could secure the money. He thereupon acquiesced in taking the certified check, but would not take that one of the checks which was uncertified. All of the witnesses agree that the parties were together between two and two and a half hours while these checks were being certified, and while the figures were being gone over and the matter explained.

Finally the whole matter was explained to Barber, and he understood it, or said that he did, and took the checks and left. Coming out of the lawyer's office he informed his friend Mollinelli that he was going away, but had not determined whether to go to California or Italy. It appears that he had, between December 3d, 1902, and June 26th, 1903, cleaned up his business, so that he had the $1,000 from the sale of the fruit store, the $3,500 from the sale of the lease (less about $900 paid to the mortgagee), and, in addition, that which was coming to him from the Rosa Schmidt estate. This latter sum was about $4,000. He had this money in bank as executor, and it turned out that it was just about, if not exactly, his share, and he withdrew that money for his personal use, making all told about $7,600 in cash.

He left Newark on the last-named day, and, according to his family, entirely and successfully disappeared from view. The defendants, however, proved, without contradiction, that he went

to his old home, where his relatives were, at Peruza, and is now there. They also proved, without contradiction, that the family received a letter from Italy conveying that information to them some five or six weeks after the date in June, 1903, when he left.

It is contended by the complainant that John Barber was insane, and was not competent to properly transact business, or to know the value of what he had or of that with which he was dealing. They base this, so far as their oral testimony in this cause is concerned, upon the evidence of a physician, John Barber's eldest daughter, his eldest son, a niece who did not live with them, but did live in Newark; a barber who lived in the neighborhood, and two tenants of one of the flats in the house.

A fair statement of their testimony is that John Barber, up to 1901, was a kind, considerate father, and a man who, although illiterate and of humble origin, was intelligent; that, beginning at the time just named, he became a suspicious man, believing or expressing the belief that his wife and children were bad sexually, and were also robbing him or taking money from him. He was always a man who drank alcoholic liquors, although he does not appear often to have been intoxicated. They testify that he was constantly making these charges of immorality and of dishonesty against his family; that he would watch for the coming of the men that he suspected were coming to his home to have sexual relations with his family.

Some of the testimony is explicable from other of the testimony in the suit. For instance, it is testified that when he accused the children of taking money from the till they denied it and said that it must have been taken by somebody else, outsiders, strangers, and he locked the gates, or took certain precautions which he did take, because he wished to be sure that no one else had access to the place where the money was, excepting the family.

It is also in evidence that one of the girls was in the habit of receiving her young man caller in the front hall of the building, and of staying down there with him until very early hours of the morning. He vehemently objected to this conduct, in which she was upheld by the other members of the family. His out-

bursts of anger and charges of immorality or badness may be, to a great extent, traceable to such incidents or causes.

None of the testimony of the complainant concerns the condition of this man's mind in the transaction of business, or casts any direct light upon his ability to transact business. There is some little evidence by the complainant's witnesses that he did not at times make correct change to purchasers, but such evidence is very trifling in amount and weight. It is possible, in my view, that, leaving out the physician who testified on behalf of the complainant, all that the complainant's witnesses testified to may have been true without in any way proving that the man was not perfectly competent to transact business and to know the value of his property, and to negotiate intelligently for its sale. I think it is quite possible that an Italian who was in the habit of drinking, and who was angered at his family, might have raved and stormed at them and accused them of all kinds of things, and yet have had entire mental equipment of a sound nature to enable him to transact his ordinary business with all the skill that he ever possessed. The physician produced by the complainant did give his opinion that the man was not able to transact business, but such opinion was not based upon any experience with the man in this respect, and was based solely upon his view of what he termed Barber's "delusions." These "delusions," according to the physician, were that members of his family were immoral, and that they were robbing him. According to his testimony, he had been suffering from the disease which produced these delusions for at least two years prior to the 26th of June, 1903.

I am inclined to think, from the testimony, that this man had no delusions in the proper sense of that term. The doctor assumed that he had delusions, or testified that he had delusions, and then testified that one thus circumstanced would not have been able to transact business. But all of the testimony shows that these alleged delusions were never disclosed to anybody excepting those people above named, all of whom were members of his family, or were in his own house; that he never disclosed them to outside persons, excepting the doctor, under any circum-

stances; never mingled his family affairs with his business dealings, and never, in conducting his business, was diverted therefrom by any outside topic.

I am inclined to think that he did not have delusions, but did have certain grievances against his family which may or may not have been well founded.

The uncontradicted testimony is that the family did as it pleased, practically, in the matter of taking money from the store, and that he was displeased with the conduct of one or more of the girls. As I have before said, I think it quite possible that a man of the race of which this man was, and of his condition of life, and who was accustomed to drinking, might well behave in the way that he is testified to have behaved in his family and with his family without in any way having any mental aberration or mental unsoundness.

In addition to the oral testimony delivered at the trial, the complainant also produced and put in evidence a finding of a commission in lunacy on the 9th day of September, 1903, declaring John Barber a lunatic, of whom subsequently his eldest daughter was appointed guardian. This proceeding was, of course, *ex parte,* and is only *prima facie* evidence. *Mott* v. *Mott, 49 N. J. Eq. (4 Dick.) 192* (at *p. 196*), and cases cited; *Kern* v. *Kern, 51 N. J. Eq. (6 Dick.) 574* (at *p. 583*). I will not further discuss the weight of this finding, because, while in a doubtful case I should give great weight to the determination of commissioners and a jury, I do not see that it is entitled to any more than *prima facie* effect in the face of a fully-tried issue in this court.

Particularly would I be inclined to treat it in the way indicated when, as in this case, the alleged lunatic was not served with notice of the commission and was not present, and was not seen or examined by the commissioners or the jury.

The complainant also produced the judgment in ejectment, which has been heretofore referred to and dealt with in a previous part of this opinion.

On behalf of the defendants a medical expert was produced, the gist of whose evidence was that if this man was suffering

from delusions of the character testified to by the complainant's physician, such delusions would have persisted; that the subject could not or would not listen to reason concerning them (which it was shown that this man did), and that such subject would not or could not refrain from disclosing these delusions to every-one with whom he came into intimate or prolonged contact; that if the subject had any such delusions, whether induced by the disease known as "paresis" or that produced by alcohol and termed "alcoholic pseudo-paretic dementia," he would not have been able to do the things which he was indisputably proven to have done in the manner and way in which they were done and shown to have been done by him.

This physician further testified that it was impossible for a man to have had either of the above-named diseases for the period claimed by the complainant without having shown physical evidences thereof, whereas all of the testimony shows Barber to have been in practically perfect health physically, being large, robust, ruddy and hearty.

The next class of evidence adduced by the defendants was of those who had casual dealings with Barber up to the time of his leaving Newark. These witnesses were men of substance and intelligence. They were lawyers or business men, and all testified that in their dealings with him—buying fruit or ordering fruit—they were waited upon in a proper manner, and saw nothing of a suspicious nature about Barber, nothing that led them to suspect that he was not sound in mind and in body, and that in whatever conversations they had with him he seemed perfectly rational.

The defendants also produced a lawyer named Egner, who was consulted by Barber concerning the making of a bond and mortgage for him, and who made the same and had them executed before him as a master; Mr. Trimble, who closed the deal for the fruit store, and who subsequently had the interviews concerning his participation in the litigation over the Rosa Schmidt estate; Mr. Smith, who had charge of that litigation, and who also had charge of the Rosa Schmidt estate in the orphans court and in the partition suit, and Judge Ten Eyck, who had the

closing of the deal at the sale of the leasehold. These four lawyers had every opportunity to observe this man under most critical circumstances, and each of them obtained the distinct impression that the man was rational—knew what he was doing —and appreciated the transaction taking place.

In addition thereto the defendants produced an intimate friend of Barber, Mollinelli; the Millers, who purchased the leasehold, and Zazzalli, who purchased the fruit store, and they all testified to the details of the transactions with Barber, and to the fact that he was entirely rational, knew what he was doing, and was intelligent and shrewd.

When one considers all of the testimony, I do not see how a reasonable conclusion can be reached that this man lacked mental soundness. The rule as to the mental capacity requisite in cases of ordinary contracts is well settled in this state, and the test is, Did the person whose act is brought in judgment possess sufficient ability at the time he did the act to understand in a reasonable manner the nature and effect of his act or the business he was transacting? *Kern* v. *Kern, 51 N. J. Eq. (6 Dick.) 574* (at *p. 579*) (*Vice-Chancellor Green, 1893*). In that case the vice-chancellor observed:

"The old doctrine that the mind, although it has different faculties, is one and indivisible, and that if any of its parts is disordered, or if it is in any way diseased, or its healthy operation in any function disturbed, it is an unsoundness which affects the whole organ and renders the person legally of unsound mind and incapable of entering into a civil contract, is no longer recognized.

"The question, under the present state of the law, is not whether the mind of the party was in any way affected or impaired, but whether, such being the case, the impairment or defect of the mind influenced or inspired the act which is the subject-matter of consideration, for, admitting that the party was subject to some delusion, or that his mind was in some faculty impaired, if the act challenged is not traceable to, and has not probably been influenced by, the defect of intellect, but is the result, so to speak, of the action of the unimpaired faculties of his mind, it will not be disturbed."

And further (at *p. 586*) :

"A man may be mentally unsound, in a medical point of view, from certain conditions which exist, which would not, in a legal sense, relieve him from responsibility. He may be subject to mania, and medically of unsound mind, yet if the peculiar phase of mania had no influence upon the act brought in question, such act is not, in the law, invalid. He may be an imbecile, and medically of unsound mind, but if he has sufficient mind to reasonably understand the act which is brought in question, he is legally competent."

Applying the principles deduced from the cited case and those which it cites, it is clear that the complainant has utterly failed to prove that there was any such impairment of John Barber's mind as made him incapable of understanding in a reasonable manner the nature and effect of his acts or of the business that he was transacting, or that the act challenged was traceable to or influenced by any delusion. My impression is that he had, by reason of his grievances against his family, determined to leave. He expressed to his intimate friend his dissatisfaction with the expenses under which he was laboring, and stated that his family were living too expensively; that he wished them to move out of the high-priced neighborhood like Broad street, and enable him to rent the flats they were then occupying to others, and himself to rent a flat in a less expensive, neighborhood for them. He also objected to their taking money, as they had been accustomed to do, from the till in the store. He also, according to their testimony, though not confirmed by outsiders, objected to their morals in sexual matters. As has been already seen, he was in a position to gather together quite a little money, and had expressed a desire to return to Italy, and at one time had asked his family to do so. I think that he conceived the desire or the intention to go back to Italy, or to at least leave his family; that he cast about him to get what money he could; that he had three sources from which to get it; one was his business, another was the leasehold and a third was whatever was coming to him from the estate of his deceased sister. I cannot find that in any one of these matters, each of which he

settled up, he failed to bargain as any man similarly situated would have bargained. It may possibly be true that, with respect to the leasehold, he could have obtained more if he had been willing to wait or to seek other buyers after a more extensive endeavor. But if it be true, as I have suggested, that he was now desirous of leaving, it was perfectly natural for him to close when he found that he had gotten as much as he could get from the customers that he knew of. In other words, he had attempted to sell this lease to other people and had been unsuccessful. He finally found a man who would negotiate, and for three months he carried on negotiations, and finally, as I have stated, he closed. In respect to the Schmidt estate, he seems to have clearly understood at all times the situation, which was rather a complicated one. He was executor of the estate, and as such was, of course, the trustee of whatever moneys he received. He was a beneficiary under the will, and as such entitled to his share of the personalty, and was also entitled to one-third of the amount realized in the partition suit. He seems in some way to have arrived at the exact amount to which he was entitled, and to have taken that, and no more. The other beneficiaries feared that he had taken more, and levied an attachment upon his interest in the estate, but it subsequently developed that he had not taken from the funds in his hands as executor any more than his share of the personalty and of the proceeds of the sale of the realty.

In the sale of his fruit business, as I have before stated, he seems to have obtained all that is proven to have been the full value of it. We therefore see that in every business matter (which is the only thing with which we are concerned) he displayed such intelligence as a man of his origin and upbringing would have, and seems to have bargained with shrewdness, and to have seen to it that his bargain was carried out to its culmination with entire regard to commercial principles and the proper conduct of business. Under these circumstances I do not see how the court would be justified in finding that this man lacked mental soundness.

This conclusion makes it unnecessary to enter into an extended consideration of the question of the adequacy of the price paid by Miller to Barber for the leasehold. Much of the testimony offered was with respect to this matter. The solution of the question is not unattended with difficulty. The subject-matter is not one that can properly be said to have a market value. A lease having about five years to run, with the privilege of an extension if an agreement could be reached as to rent, with a proviso that the building must be removed if no agreement is reached for extension, the building being one unadapted for commercial use excepting the first story, and that only usable for a store of modest dimensions, the term being too short to justify the removal of the building and the erection of another, show elements making it extremely difficult to say what the value of such a lease was.

The experts themselves in their testimony demonstrate the uncertainty of the whole subject. Scarcely any two figured with the same factors. Some based their idea of value upon what the property would be worth to one who greatly desired it and was willing practically to lose money on it for the additional value such location would give his business. Others figured upon it entirely from an investment standpoint. They varied in their estimates of value from nothing to $10,000 or more. I can only say that the complainant did not, in my view, establish by the evidence that there was any market value for this lease in excess of what was paid for it.

I will advise a decree dismissing the bill and sustaining the prayer of the cross-bill as to an accounting.

The decree will be settled upon notice.